UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| JANE DOE, | ) |  |
|---|---|---|
|     *Judgment Creditor* | ) | |
| v. | ) | No. 2:99-cv-262-JHR |
| WAYNE D. MANSON, | ) | |
|     *Judgment Debtor* | ) | |

### *MEMORANDUM DECISION AND ORDER ON JUDGMENT CREDITOR'S MOTION FOR INCREASED PAYMENTS AND INJUNCTION*

In the wake of a disclosure hearing held on January 20, 2011, the judgment creditor ("Creditor") seeks (i) an order increasing the amount of the judgment debtor's ("Debtor's") monthly payment from $113.00 to $167.28 effective immediately and to $447.28 effective April 1, 2011, and (ii) an affirmative injunction requiring the Debtor to seek remunerative employment of not less than 20 hours per week and to remit all proceeds from that employment to her. *See* Plaintiff's Post-Disclosure Memorandum and Motion for Relief ("Motion") (Docket No. 76) at 6, 8. For the reasons that follow, the motion is granted in part, to the extent that I order an increase in the Debtor's monthly payment to $320.42 effective April 1, 2011, and otherwise denied.

### I. Procedural Background

On June 23, 2000, this court entered a judgment in favor of the Creditor as against the Debtor in the amount of $250,000.00. *See* Judgment (Docket No. 21). The Creditor also was awarded $738.81 in costs of suit. *See* Bill of Costs (Docket No. 22). The Creditor represents, and the Debtor does not contest for purposes of the instant motion, that the total amount due is now at least $393,343.84, taking into account the accrual of post-judgment interest based on the

one-year Treasury bill rate, compounded annually. *See* Motion at 1 & Exh. A thereto; [Debtor's Response] ("Response") (Docket No. 77).

Prior to 2011, three disclosure hearings were held in this matter, on September 18, 2000, June 17, 2003, and April 18, 2006, with the latter hearing continued to July 6, 2006. *See* Docket Nos. 25, 29, 39, 53. Following the hearing in 2000, the Debtor was ordered to turn over savings and investment accounts in the combined amount of $7,994.70. *See* Docket No. 25. Following the 2003 hearing, he was ordered to pay $50.00 a month toward the balance of his judgment debt. *See* Docket No. 30. Following the 2006 hearing, the court increased his monthly payment to $113.00 and entered an order attaching, with enumerated exceptions, certain distributions made from the Alice K. Manson Revocable Trust under trust instrument dated February 17, 1999, as amended. *See* Docket No. 55 at 13-14.

During the disclosure hearing held before me on January 20, 2011, the Creditor was represented by counsel and the Debtor appeared *pro se*. The Debtor testified, and the Creditor offered 12 exhibits, all of which were admitted into evidence without objection. Thereafter, on February 3, 2011, the Creditor filed the instant motion. *See* Motion. The Debtor, acting *pro se*, filed a response on February 15, 2011, *see* Response, and the Creditor filed a reply on February 22, 2011, *see* Plaintiff's Reply Memorandum ("Reply") (Docket No. 78).

## II. Discussion

### A. Requested Increase in Monthly Payment

The court has the authority to "determine the amount, if any, of the installment payments that the judgment debtor must make to the judgment creditor." 14 M.R.S.A. § 3126-A. The Debtor's pension benefit payments, his sole source of monetary income, are exempt from an installment-payment order "to the extent reasonably necessary for the support of the debtor." *Id*.

§§ 3126-A(1)(E) & (2), 4422(13)(E). A debtor bears the burden of making a *prima facie* showing of entitlement to a claimed exemption, following which the burden shifts to the creditor to show that an exemption is not properly claimed. *See, e.g., Steelstone Indus., Inc. v. McCrum*, 2001 ME 171, ¶¶ 8-9, 785 A.2d 1256, 1258-59.

For the year 2009, the Debtor, who lives alone, reported receipt of a gross pension benefit of $25,281.00 and a Social Security benefit of $564.00, on which he paid federal income taxes of $1,431.00, leaving net proceeds of $24,414.00 – an average of $2,034.50 per month. *See* Plaintiff's Exh. 2.[1] His listed monthly expenditures, including debt payments, a car lease payment, auto insurance, prescription drug costs, utilities, food, and gasoline, average $2,059.85. *See* Plaintiff's Exh. 1. His expenditures thus exceed his income.

Nonetheless, the Creditor argues that the Debtor has made certain expenditures that are not reasonably necessary to his support and that reflect an ability to pay her more on a monthly basis than $113.00. *See* Motion at 2. These categories of expenditures are (i) donations to charities averaging $15.16 monthly, (ii) two sets of temporary recurring monthly payments, one resulting from a marketing scam and the other unexplained, averaging $39.12 monthly, and (iii) a car lease payment in the amount of $430.00 per month. *See id.* at 2-6. The Creditor seeks an increase to $447.28 in the Debtor's monthly payments, broken down as follows: a $54.28 increase, to $167.28, effective immediately, and a further $280.00 increase, to $447.28, effective April 1, 2011. I agree that an increase is warranted, but not by the full requested amount. For the reasons that follow, I grant the Motion in part insofar as it seeks an increased monthly

---

[1] The Debtor's gross income may have been further reduced by payment of state income taxes, however, there is no evidence of the amount of such taxes, if any, paid for the year 2009. Nothing turns on the omission.

payment and order that the Debtor's monthly payment be increased by a total of $207.42, to $320.42, effective April 1, 2011.[2]

## 1. Donations to Charity

The Creditor seeks an increase of $15.16 monthly in the Debtor's payments to her based on the monthly average of charitable contributions he made for the period from August 2009 through July 2010, as reflected on his Capitol One credit card statements. While I agree that charitable contributions cannot be deemed reasonably necessary to the Debtor's support, the Creditor bases his calculation on too narrow a time frame.

The Debtor submitted Capitol One credit card statements for the period from December 11, 2007, through December 10, 2010. *See* Plaintiff's Exh. 9. Those statements reflect total charitable contributions of $267.00, consisting of three donations to Special Olympics totaling $160.00, one of $50.00 in August 2009, one of $50.00 in December 2009, and one of $60.00 in May 2010, and three donations to Mothers Against Drunk Driving totaling $107.00, one of $35.00 in March 2008, one of $35.00 in September 2009, and one of $37.00 in May 2010. *See id.*[3] Over the three-year period at issue, these donations averaged $7.42 monthly. The Debtor testified that he did not plan to make these donations but, rather, made them in response to phone solicitations, and that he tended not to answer the phone to avoid such solicitations. Regardless of whether the Debtor planned to make these donations, he found the resources to do so when asked, and they are not reasonably necessary to his support. An adjustment upward in the

---

[2] I decline to order a partial increase in payments effective prior to April 1, 2011. The total increase is substantial, warranting sufficient notice to make appropriate adjustments.

[3] There are three missing Capitol One statements, for the periods June 11, 2008, to July 10, 2008, November 11, 2008, to December 10, 2008, and October 11, 2010, to November 10, 2010. *See* Plaintiff's Exh. 9. The Creditor does not ask the court to assume that any charitable payments were made during those time frames. In any event, because the Debtor's charitable payments were erratic, I decline to do so.

Debtor's monthly payment to the Creditor, albeit in the sum of $7.42 rather than the requested sum of $15.16, therefore is reasonable and appropriate.

### 2. Marketing Scam and Unexplained Payments

The Debtor's Capitol One credit card statements reflect charges totaling $351.73 for payments to various grant entities, *e.g.*, "GrantFundingSearch," "Grant University," and "GFS-Grants," in September and October 2008 and December 2008 through February 2009.[4] *See* Plaintiff's Exh. 9. The Debtor testified that he (i) looked into grant writing as part of a volunteer job as director of the Kittery Historical and Naval Museum ("Museum"), (ii) signed up, for a $1.98 initiation fee, for online grant-writing education services that he eventually realized were a scam, resulting in recurring monthly charges to his credit card of $69.95 that he did not initially notice, (iii) contacted Capitol One upon noticing the recurring charges, but was reimbursed by them for only one month's recurring charge, and (iv) sought reimbursement from the Museum only for the initial $1.98 fee and absorbed the remaining loss from his personal funds.

The Debtor's Capitol One credit card statements also reflect a charge of $29.95 in each of the months of October and November 2008 and January and February 2009 for payments associated with an "866" phone number or numbers. The Debtor was unable to explain those charges, but the Creditor suggests that they may be related to the grant entity charges since they began the month after those charges and ended at about the same time. *See* Motion at 3-4.

On account of these charges, the Creditor seeks a monthly increase of $39.12 in the Debtor's payment to her, calculated by adding the sum of $349.75 (at least five months of unreimbursed recurring charges for the scam online service) to the sum of $119.80 (at least four

---

[4] As noted above, the Debtor's Capitol One statement for the period from November 11, 2008, to December 10, 2008, is missing. *See* Plaintiff's Exh. 9.

months of unexplained recurring charges associated with the 866 phone number or numbers) and dividing the resulting sum, $469.55, by 12.

I decline to make this requested adjustment. The Debtor neither planned nor budgeted for these expenditures. Rather, he fell victim to an online scam, absorbing a loss for a few months' charges before he successfully put an end to them. His absorption of that loss does not reflect an ability to make higher payments on an ongoing basis to the Creditor.

### 3. Car Lease Payment

Commencing on December 22, 2007, the Debtor began leasing a 2007 Chrysler Pacifica automobile valued at $20,649.00 for $430.07 per month. *See* Plaintiff's Exh. 6. The 39-month lease term expires on March 22, 2011. *See id*. The Debtor testified that, for the past 25 or 30 years, he has chosen to lease rather than buy vehicles to obtain a better car for the money and to avoid responsibility for mechanical repairs other than those pertaining to normal wear and tear. As of the time of the Debtor's 2006 disclosure hearings, he was leasing another relatively new vehicle, a 2005 Dodge Caravan, for $422.83 monthly. *See* Docket No. 55 at 4.

As the Creditor points out, *see* Motion at 4, Maine law provides for exemption of a "debtor's interest, not to exceed $5,000 in value, in one motor vehicle[,]" 14 M.R.S.A. § 4422(2). The Creditor argues that, whether by serendipity or design, the Debtor's car leasing practices have enabled him to avoid the effect of the cited statute, pursuant to which, if he owned a vehicle, it would be subject to seizure and forced sale, with any proceeds above $5,000.00 remitted to her. *See* Motion at 5. Beyond this, she reasons that, regardless of whether the Debtor leases or buys a vehicle, he is spending considerably more than the approximately $150.00 monthly that she suggests is reasonably necessary for that purpose, as illustrated by copies of recent Portland Press Herald advertisements that she appends to her Motion. *See id*. at 6; Exh. B

thereto. On this basis, she seeks an increase of $280.00 in the Debtor's monthly payments to her, the difference between a car payment of $430.00[5] and one of $150.00. *See* Motion at 6.

The Creditor makes a persuasive case that the Debtor is spending more than is reasonably necessary to lease or purchase a car and that a lower allowance for that need would better comport with the spirit of the Maine vehicle exemption statute. By virtue of this order, the Debtor is hereby placed on notice that an adjustment upward will be made on account of the excessive cost of his current car lease arrangement, presenting an opportunity for him to minimize any resulting hardship by making appropriate car lease or purchase arrangements when his current car lease expires on March 22. Nonetheless, I decline to increase his monthly payment by the full requested sum of $280.00, the Creditor having neglected to take into account other expenditures typically entailed in the lease or purchase of a car, such as the provision of a down payment and the payment of sales taxes.

An appropriate example, in view of the Debtor's practice of leasing new vehicles, is contained in the Creditor's own exhibit, which reflects the offer of a 36-month lease for a new 2011 Toyota Camry, valued at $18,994.00, for $147.00 per month. *See* Exh. B to Motion. The "fine print" reveals that the offer entails the payment of $1,999.00 at lease signing and excludes the cost of sales tax and title and registration fees. *See* Exh. B to Motion. I take judicial notice that sales tax of 5 percent on such a vehicle would total approximately $950.00. The approximately $3,000 in down payment and sales tax costs, divided over the 36-month term of the lease, adds roughly $83.00 monthly to the nominal $147.00 cost per month to lease the vehicle, for a total true cost of $230.00 monthly. I conclude that a reasonable monthly allowance in today's market for the lease or purchase of a vehicle is $230.00. The Debtor's existing lease

---

[5] The exact figure, as noted, is $430.07.

payment of $430.00 exceeds that sum by $200.00. Thus, an adjustment upward of the Debtor's monthly payment to the Creditor in the further sum of $200.00 is reasonable and appropriate.

### B. Requested Injunction To Seek Work

The Debtor, a retired teacher, has volunteered at the Museum for 21 years, most recently in the capacity of director, a position for which he was selected by the Museum's board of trustees. The Museum is closed from December through March and reopens in April with weekend hours only. The Debtor spends two half days a week at the Museum during its off-season and three to four days a week there during its regular season. A full day of volunteer work at the Museum lasts from five to six hours. The Debtor's duties at the Museum include setting up displays and exhibits, writing news releases and grant proposals, and public relations, including greeting visitors.

When asked at the January 20, 2011, disclosure hearing whether he had tried to find work, the Debtor testified that doing so would have been difficult for the past three or four years, during which he has undergone dialysis three days a week for treatment of End Stage Renal Disease ("ESRD"). He testified that he schedules his work at the Museum around that need and gets there when he feels he can.

The Creditor seeks an affirmative injunction in the form of an order that the Debtor seek paying work of not less than 20 hours per week and remit all proceeds from that work to her. *See* Motion at 8. She reasons that:

1.   The concept of a seek-work order is well established under state law, albeit in the "analogous" context of the obligation to pay child support. *See id*. at 7 (citing 14 M.R.S.A. § 3128-A; *Koszegi v. Erickson*, 2004 ME 113, ¶¶ 23-24, 855 A.2d 1168, 1173-74).

2. The Debtor could perform the same sorts of duties at a retail establishment for minimum wage as he does at the Museum and greatly increase the amount of his monthly payment to the Creditor. *See* Motion at 7-8. Like the child-support obligor in *Koszegi*, he has been "voluntarily underemployed." *Id*. at 8.

3. The court has broad equitable powers to issue an injunction when a plaintiff has no adequate remedy at law. *See id*. at 7. The Creditor has no adequate remedy at law because the Debtor is making payments pursuant to a "paltry repayment plan [that] will never satisfy the debt[,]" with interest "accumulating and accelerating as [the Debtor] makes his token payments." *Id*. at 8; *see also* Exh. A thereto. Moreover, in the Creditor's view, forcing the Debtor to seek work will require him to bear some personal burden as the result of the "wanton and malicious tortious acts" that led to the judgment against him. *See id*.

I decline to grant the requested injunction. Maine expressly permits the issuance of seek-work orders only in the context of child support obligations. *See* 14 M.R.S.A. § 3128-A ("If a child support obligor claims inability to pay in a disclosure proceeding . . ., the court may order the obligor to seek employment or participate in work activities as defined by section 407(d) of the Social Security Act, and make progress reports on that activity to the court or the Department of Health and Human Services" unless the obligor proves by a preponderance of the evidence that he or she "is engaged in diligent, bona fide efforts to seek work" or "does not have the ability to seek work."). The Creditor points to no authority for the proposition that, pursuant to Maine law, such orders have been issued in other contexts, and I find none.

In any event, even assuming that the issuance of such an order might be appropriate in a judgment debtor context, I do not find it appropriate in the circumstances of this case. Whereas, in *Koszegi*, a divorced pensioner was deemed "voluntarily underemployed" for purposes of

9

payment of child and spousal support obligations when he retired and received a military pension at the age of 40, had no apparent limitation on his work capacity, and chose not to seek employment, *see Koszegi*, 2004 ME 113, ¶¶ 13-14, 855 A.2d at 1171, the Debtor is in his 60s and suffers from ESRD, for which he receives dialysis three days a week. The Museum has accommodated the Debtor's illness, permitting him to structure his schedule so that he does not work on the days on which he has dialysis and to come to work when he is able to do so. I am strongly disinclined to order a retired person of the Debtor's age, with an ESRD diagnosis, to seek even part-time work. Even if I were inclined to do so, I am skeptical that a paying employer would be willing to offer the defendant the sort of flexible part-time work accommodations he requires, and the Creditor offers no evidence suggesting otherwise.

### III. Conclusion and Order

For the foregoing reasons, and based on evidence presented at the disclosure hearing held before me on January 20, 2011, the Motion is **GRANTED** in part, to the extent that the Debtor's monthly payments are increased, albeit by a smaller amount than requested, and otherwise **DENIED**.

In accordance with the foregoing, it is hereby **ORDERED** that, until further ordered, the installment to be paid toward the instant judgment by the Debtor is increased from $113.00 to $320.42 per month effective as of the next payment due date of April 1, 2011. Installment payments shall continue to be due on the first day of each month and to be paid to the order of Kelly, Remmel & Zimmerman. The attachment of distributions from the Alice K. Manson Revocable Trust is unaffected by the instant order and shall continue in effect as set forth in the court's order of July 7, 2006. *See* Docket No. 55 at 13-14.

**SO ORDERED**.

Dated this 3rd day of March, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge